**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**PAUL HASSINGER,**

    **Plaintiff,**

**v.**

**Case No: 6:12-cv-1052-Orl-28GJK**

**SUN WAY ENTERPRISES, INC., and**
**NARENDRA MODHA,**

    **Defendants.**

## MEMORANDUM DECISION AND ORDER

The cynical saying that "no good deed goes unpunished"[1] would be affirmed were Plaintiff, Paul Hassinger, to prevail in this case. He does not. Plaintiff has sued Defendants, Narendra Modha ("Mr. Modha") and Mr. Modha's company, Sun Way Enterprises, Inc., for violation of the Fair Labor Standards Act[2] ("FLSA"), claiming that Defendants failed to pay him the required minimum wage and failed to pay him at an overtime rate for hours he allegedly worked in excess of forty per week. In his Second Amended Complaint (Doc. 16), Plaintiff also claims that Defendants retaliated against him—also in violation of the FLSA—for filing this lawsuit.

The case proceeded to a non-jury trial on January 28 and 29, 2014, during which witnesses testified and Defendants' exhibits were received in evidence.[3] The parties

---

[1] Most often attributed to American author and political figure Clare Boothe Luce (1903-1987).

[2] 29 U.S.C. §§ 201-219.

[3] Plaintiff did not submit any exhibits into evidence during the trial.

thereafter submitted proposed findings of fact and conclusions of law. (Docs. 62 & 63).

Upon consideration of the evidence and testimony presented, I issue the following opinion

in accordance with Federal Rule of Civil Procedure 52(a)(1). I conclude that Plaintiff did

not meet his burden of establishing a minimum wage or overtime violation, nor did he

establish that he suffered compensable damages on his retaliation claim.

## I.    Trial Testimony and General Findings of Fact

The unlikely path that led to Plaintiff and Mr. Modha meeting began in a Florida

prison where Plaintiff was serving a sentence for a felony sexual offense. While in prison,

Plaintiff befriended Kishorkumar Modha ("Kishorkumar"), Mr. Modha's brother, who was

also serving a sentence for a sex offense. Eventually, Plaintiff completed his sentence and

was awaiting release to begin his term of probation, but before he could be released he

was required to establish that he had an appropriate place to live. (Trial Tr. Day 1 at 79;

Trial Tr. Day 2 at 108, 115-116).[4] This requirement ostensibly was to ensure that he would

not take up residence in proximity to schools, parks, or other places where children were

likely to gather; doing so would not be in conformity with the terms of his probation. Upon

completion of his sentence, Plaintiff continued to be incarcerated for at least a few weeks

because he did not have such a residence available. (Trial Tr. Day 2 at 108-09, 115-16).

To help his friend gain release, Kishorkumar enlisted the assistance of Mr. Modha,

who had, a short time earlier, opened a small, family-run gas station/convenience store on

U.S. Highway 1 in Mims, Florida, known as A.J.'s. Kishorkumar called Mr. Modha and

urged him to permit Plaintiff to live and work at A.J.'s so that Plaintiff could be released

---

[4] The transcript of the two-day bench trial is contained in two volumes in the record
(Docs. 57 (Day 1) & 58 (Day 2)). References to these transcripts will be indicated by "Trial
Tr. Day 1" or "Trial Tr. Day 2" followed by the page number(s).

from custody. Initially, Mr. Modha declined Kishorkumar's request, but Mr. Modha's resolve weakened as he received pleas from Plaintiff's mother, stepfather, and wife—who was in need of financial assistance to care for their child—all of whom begged Mr. Modha to allow Plaintiff to live and work at A.J.'s. (Id. at 108-16). Then, Plaintiff's probation officer telephoned Mr. Modha, visited A.J.'s, and determined that the store would be an appropriate place for Plaintiff to live while on probation. (Id. at 109-11, 116). Eventually, Mr. Modha relented and agreed to allow Plaintiff to live and work at A.J.'s, whereupon Plaintiff was released from prison in 2006. (Trial Tr. Day 1 at 80; Trial Tr. Day 2 at 111, 113, & 116).

The day of his release, Plaintiff's parents drove him to A.J.'s, where he and Mr. Modha met for the first time. (Trial Tr. Day 1 at 80; Trial Tr. Day 2 at 116). The two men entered into discussions about the anticipated arrangement. (Trial Tr. Day 2 at 118). Plaintiff is a native of Thailand but was adopted by a United States citizen nearly forty years ago. (Trial Tr. Day 1 at 78-79). Although Plaintiff is intelligent and sophisticated—as evidenced by his American high school diploma and fifteen years of experience working for the United States Armed Forces banking system—he speaks English with a heavy accent. Mr. Modha is from India and had been in the United States approximately two years when he first met Plaintiff; he has a seventh-grade education and speaks English with difficulty. (Id. at 191-92; Trial Tr. Day 2 at 101-02). Notwithstanding the language barriers, the two men reached an oral agreement that Mr. Modha would provide Plaintiff with work, meals, and a place to live at the store. (Trial Tr. Day 1 at 80-81; Trial Tr. Day 2 at 118-19). Plaintiff told Mr. Modha that in addition to room and board, he required a salary of $600 per month as consideration for helping out at the store. (Trial Tr. Day 1 at 181;

3

Trial Tr. Day 2 at 118-20). Mr. Modha agreed, and Plaintiff immediately moved into A.J.'s. There was no mention of an hourly rate during this discussion or thereafter—until the filing of this lawsuit.

At the time Plaintiff arrived at A.J.'s, Mr. Modha had a part-time employee assisting in the store. That employee was responsible for restocking the cold drinks in the coolers, sweeping, mopping, and cleaning the store each day. (Trial Tr. Day 1 at 186-87). She also was responsible for blowing debris from the parking lot three times a week. (Id. at 187). That employee worked two or three hours a day, seven days a week. (Id.; Trial Tr. Day 2 at 107-08). It was agreed that Plaintiff would take over that employee's duties. (Trial Tr. Day 1 at 181-82; Trial Tr. Day 2 at 118-19). For approximately two weeks after arriving at A.J.'s, Plaintiff observed the part-time employee execute her duties, after which she was let go and Plaintiff assumed her duties. And, after Plaintiff's employment at A.J.'s ceased in 2013, these responsibilities were performed by a part-time employee who was hired to replace Plaintiff; that employee also worked two to three hours per day. (Trial Tr. Day 2 at 35, 92-93).

The living accommodations at A.J.'s were undisputedly sparse. Initially, Plaintiff slept on a thin mattress on the floor of the store. At some point, Plaintiff discarded the mattress and replaced it with a mat. Later, he moved into an outbuilding provided by Mr. Modha. At all times, Plaintiff had access to toilet facilities and telephone service.

Conditions of Plaintiff's probation severely restricted his freedom of movement. In addition to being banned from places children were likely to gather, Plaintiff was required to be at A.J.'s from 10:00 p.m. to 6:00 a.m. each day. (Trial Tr. Day 1 at 80). As a result of this curfew, his work, socialization, and recreation for the most part took place at A.J.'s—

4

he had nowhere else to go. After a couple of months, Plaintiff sought other work at McDonald's and Burger King restaurants, but he was not hired. (Id. at 182). When Plaintiff could not find other work, Mr. Modha increased his salary to $650 per month. (Id. at 188). Additionally, it is undisputed that by July 2009, Mr. Modha had increased Plaintiff's salary to $750 per month and that he increased it to $800 per month in June 2011 and to $900 per month in April 2012.

Plaintiff's counsel describes the relationship that evolved between the parties as one of peonage, but that is a gross mischaracterization. It would be more accurate to say that Plaintiff was treated as a member of the Modha family, which included Mr. Modha's wife, Krupa; their three children; and Minakshi—Kishorkumar's ex-wife—and their two children. (Trial Tr. Day 2 at 4-5). Plaintiff enjoyed privileges not offered to any other employee of the business. He was permitted to eat for free any food offered for sale on the premises, and he indeed partook of that food. Additionally, it was routine for Plaintiff to go to the Modha home for meals. In the afternoon, he would drive to the Modha home for a lunch meal prepared by Krupa. During these visits he often would also shower and take a nap. (Trial Tr. Day 1 at 114-15). On occasion, he also helped with household chores, and sometimes he played with the Modha children during the lunch breaks. (Trial Tr. Day 2 at 8). He typically spent at least two hours at the Modha home during these lunch outings. (Id.). Additionally, Plaintiff sometimes returned to the Modhas' house for dinner, and if he did not, the Modhas brought dinner to him at A.J.'s. (Trial Tr. Day 1 at 115; Trial Tr. Day 2 at 19-20, 160).

After Plaintiff began living and working at A.J.'s, Mr. Modha converted some of the space at A.J.'s to a takeout Hungry Howie's restaurant. Plaintiff was also allowed to eat

5

food at Hungry Howie's, where other employees were instructed that he was to be treated as a member of the Modha family and was not to be charged for his food. (Trial Tr. Day 2 at 121). Eventually, Plaintiff applied for and received food stamps and began purchasing some of his own food, though he was still able to eat for free at the Modhas' house, A.J.'s, and Hungry Howie's. (Trial Tr. Day 1 at 112; Trial Tr. Day 2 at 223-24).

Plaintiff also always enjoyed the use of one of the Modha family automobiles. In late 2009, Mr. Modha purchased a new Dodge Avenger, which Plaintiff and Minakshi shared, although Mr. Modha paid for maintenance, fuel, and insurance. Plaintiff drove that car to the Modha home—a sixteen-mile round trip—for lunch and sometimes dinner. (Trial Tr. Day 2 at 160). He also used the car to attend out-of-town appointments required by the terms of his probation, including counseling sessions, meetings with his probation officer, and polygraph examinations. (Trial Tr. Day 1 at 138-39; Trial Tr. Day 2 at 156). Additionally, he used the car to visit his son in Daytona Beach, do personal shopping, and travel to the laundromat. (Trial Tr. Day 1 at 139, 154). Plaintiff drove the Avenger 50-60% of the time, and for the most part, Minakshi drove it the balance of the time. (Trial Tr. Day 2 at 73, 162-63). By the time of trial, the car had been driven in excess of 100,000 miles. (Id. at 74, 161). The only contribution Plaintiff made to the upkeep of the Avenger was that he would sometimes wash it along with other family cars during his lunch breaks at the Modha home.

While on probation, Plaintiff was monitored to ensure that he was complying with the terms of the court-imposed curfew. The probation officer periodically telephoned Plaintiff to determine his whereabouts. (Id. at 167-68). When Plaintiff first moved into A.J.'s, he did not have a telephone of his own, and the monitoring was done by calling the

store telephone or Mr. Modha's personal line. (Id. at 168). Because calls came in late at night, Mr. Modha eventually purchased a cell phone for Plaintiff. (Id. at 168-69). At no time was Plaintiff charged for the telephone, electricity, or water at A.J.'s. (Id. at 168).

A.J.'s was a family operation. Minakshi worked weekdays from 6:00 a.m. until 3:00 p.m. and weekends from 3:00 p.m. until closing. (Id. at 51-52, 61, & 64). Krupa worked weekdays from 3:00 p.m. until 10:00 p.m. (Id. at 6). Mr. Modha did not keep regular hours at A.J.'s, but at the beginning of Plaintiff's employment he typically was present in the store from 2:00 p.m. until 10:00 p.m. (Id. at 110). Other than these Modha family members, the only employees who worked at A.J.'s—as opposed to Hungry Howie's—during the time period involved in this case were Plaintiff and the employees who preceded and replaced him.

Defendants claim that the extent of Plaintiff's work was no more than that of the employees who preceded and succeeded him at the business, while Plaintiff claims that he worked—or should have been regarded as working—from the time the store opened until it closed. Neither account is correct. In addition to the work done by his predecessor and successor, Plaintiff also locked the doors at night and performed some other, irregular tasks, including: changing the gasoline price signage; accepting deliveries from vendors; assisting elderly and disabled customers with pumping gasoline; and, on extremely rare occasions, emptying the fuel sump pump. (Id. at 204-06).

Plaintiff also did some work in the conversion of some of the space at A.J.'s to a takeout Hungry Howie's restaurant with two walk-up windows. From time to time, Plaintiff assisted his friend, Brian Otte, whom Mr. Modha had hired to do some of the preliminary remodeling work. Plaintiff and Otte, also a convicted felon, had attended therapy classes

7

at the same facility after Plaintiff's release from prison, and they developed a friendship as a result of Otte's visits to A.J.'s during remodeling. (Trial Tr. Day 1 at 41-42). After about forty-five days, Otte's work on the project ended when a building inspector determined that required permits for the construction had not been issued. (Trial Tr. Day 2 at 142).[5] Once the Hungry Howie's opened in June or July 2011,[6] Plaintiff occasionally assisted the Hungry Howie's employees when they were busy. He also requested and was allowed to deliver pizza, and he was allowed to keep the tips he received for doing so. (Trial Tr. Day 1 at 136-37; Trial Tr. Day 2 at 14, 202). Plaintiff testified that those tips averaged $7-8 per delivery. (Trial Tr. Day 1 at 136-37).

Although Plaintiff testified that he felt that he should be paid from the time A.J.'s opened in the morning until it closed in the evening, he was not working during all of that time. While on the A.J.'s premises, he read, worked puzzles, talked with customers, took smoke breaks, ate, and meditated three times per day for at least an hour at a time. (Id. at 87 & 142; Trial Tr. Day 2 at 56, 220). Additionally, throughout his time at A.J.'s he took time to travel to his temple in Kissimmee, visit his son in Daytona Beach, make required visits to his probation officer in Cocoa, drive to Rockledge to be take polygraph tests, and drive off premises to do his laundry. (Trial Tr. Day 1 at 138-39, 154; Trial Tr. Day 2 at 156). There is no evidence that he could not leave A.J.'s as he chose.

Not including the time that Plaintiff spent working at Hungry Howie's, Plaintiff

---

[5] Otte testified that he worked on the construction project for much longer than forty-five days, (see Trial Tr. Day 1 at 22-23), but I did not find Otte's testimony credible on that point or in general.

[6] As earlier noted, Plaintiff's salary increased from $750 to $800 per month in June 2011. He also was paid an extra $100 on June 5, 2011, for helping lay sod at the Hungry Howie's. (Trial Tr. Day 1 at 119; Defs.' Trial Ex. 4 at 19).

completed his assigned duties within a few hours each day. The evidence at trial established that typically, Plaintiff would open the store at either 5:00 a.m. or 6:00 a.m. and operate the cash register for one hour before being relieved by Minakshi. Plaintiff would then return to sleep until 11:00 a.m. or noon, when he would stock the coolers and briefly attend to his other duties before heading to the Modhas' house for a homemade lunch and sometimes to shower and nap. When he eventually returned to A.J.'s in the late afternoon, he would meditate for at least an hour. He often would return to the Modhas' home for dinner in the evenings, and back at A.J.'s he would work a little more doing stocking and cleaning before locking up the store when it closed for the night.

Much testimony was devoted to describing Plaintiff's visitation with his son, who lived with his mother in Daytona Beach. Because of the nature of his criminal conviction, Plaintiff was entitled to visit with his son only if the visitation was supervised. At first, Plaintiff's ex-wife provided the required supervision, but after they had a disagreement Plaintiff was no longer allowed to go to his ex-wife's residence. (Trial Tr. Day 2 at 158). Plaintiff's parents then agreed to supervise visitation, but that arrangement soon ended as a result of Plaintiff's difficulty in getting along with his parents. (Id. at 159). At that point, the Modhas agreed to facilitate visitation by driving to Daytona Beach with Plaintiff so one of the Modhas could supervise the visitation. (Id. at 15). At times on the way back to Mims they would stop at the Daytona Sam's Club to pick up supplies for the store, (id. at 159), and Plaintiff unfairly discounts the Modhas' visitation assistance on this basis. Toward the end of Plaintiff's time at A.J.'s, his son turned eighteen and visitation no longer required supervision.

By May 2012, Mr. Modha owned three gas stations including A.J.'s, and with the

9

growing number of employees at these businesses, payroll issues became difficult to manage. (Id. at 127). Consequently, early in 2012 Mr. Modha decided to hire a payroll company, and by the summer of that year he had engaged one. (Id. at 128-29). By August 2013, the payroll company had streamlined and automated payroll at Mr. Modha's businesses, including A.J.'s. After the payroll company took over, time records were required for all employees. This was the first time that records of hours worked were kept for Plaintiff, and up until that point he had been paid monthly, in cash. From then on, Plaintiff was paid by check every other week at an hourly rate. (Id. at 132).

Krupa kept track of the employees' hours on a form provided by the payroll company. (Id. at 21-22). Under the new system, employees filled out the form indicating what time work commenced and what time it ended. (Id. at 22). Each day, Krupa had the employees initial the form showing the hours they had worked. (Id. at 21-22). On August 2, 2012, shortly after this system was implemented, Plaintiff indicated that he had stopped work at 11:00, but in fact he had finished working an hour earlier. (Id. at 22). Having seen Plaintiff cease work at 10:00, Krupa crossed out the entry of 11:00 and asked Plaintiff why he had included an extra hour. (Id.). In response, Plaintiff yelled that Krupa did not have the right to question the number of hours he included on the form and that he should get paid for all hours that A.J.'s was open. (Id. at 22-23). He then said in a loud and threatening manner, "Wait and watch what [I can] do for you next month." (Id. at 23). Shortly thereafter, the Modhas learned of the Complaint that Plaintiff had filed in this case on July 9, 2012. (Id. at 23-24).

When Mr. Modha received a letter from lawyers in Tampa advising him that his company had been sued and advertising their services, Mr. Modha asked Plaintiff why he

was suing him. (Id. at 137). Plaintiff explained to Mr. Modha that he was fifty-one years old and wished to retire; his son was no longer a minor and he wished to live with him; and he needed money for a place to live, a car, and insurance. (Id. at 139). Thereafter, Plaintiff continued to live and work at A.J.'s, eat at Hungry Howie's, and drive the Modha family car. (Id. at 132). On May 30, 2013, he delivered written notice that he was resigning effective June 13, 2013. (Id. at 32-34; Defs.' Trial Ex. 11).

In spite of the fact that Plaintiff continued to live and work at A.J.'s until the effective date of his resignation, he claims that Mr. Modha retaliated against him because he filed this lawsuit. In his Second Amended Complaint, Plaintiff raised a number of bases for his claim of retaliation, nearly all of which were found insufficient in the Order (Doc. 33) granting in part and denying in part Defendants' Motion for Summary Judgment. The ruling did, however, leave viable Plaintiff's claim that a reduction in the number of hours that he worked constituted retaliation.

Notwithstanding the ruling limiting his claim of retaliation, Plaintiff testified that Mr. Modha tried to evict him from A.J.'s. Mr. Modha admitted that after receiving notice of the lawsuit he told Plaintiff that if he did not like living and working at A.J.'s he could find another place to live and work. (Trial Tr. Day 2 at 188). This sentiment had been communicated to Plaintiff in the past as well; over the term of the parties' relationship, Mr. Modha had encouraged Plaintiff to find a nicer place to live. (Id. at 180, 182). Plaintiff admitted that he had looked for another place to live and found an apartment for rent at $800 per month, but he stated that it would not likely have been approved by his probation officer and he probably would need to rent a house. (Trial Tr. Day 1 at 163-64). He also admitted that he again considered looking for another job about a year before he filed the Complaint in

this case, but he came to the conclusion that no one would hire him. (Id. at 164). Mr. Modha made no effort to evict Plaintiff from A.J.'s; ultimately, Plaintiff voluntarily relocated to live with his son, and his employment by Defendants ended.

## II. Legal Application, Conclusions of Law, and Additional Findings of Fact

### A. Counts I and II—Wages

The FLSA requires that employers pay their employees a minimum hourly wage, 29 U.S.C. § 206, and it also requires employers to pay employees overtime wages—at a rate at least one and a half times the employee's regular rate—for work performed in excess of forty hours per week, id. § 207. Contending that Defendants failed to comply with both of these provisions, Plaintiff brings a minimum wage claim in Count I and an overtime claim in Count II of the Second Amended Complaint. However, at trial he did not establish a violation of either § 206 or § 207.

#### 1. Time Period at Issue

A cause of action for unpaid minimum wages, unpaid overtime, or liquidated damages under the FLSA must be "commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "To establish that [a] violation of the Act was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was [prohibited]." Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1162-63 (11th Cir. 2008).

Plaintiff filed this case on July 9, 2012, and thus the earliest date for which Plaintiff can potentially seek unpaid minimum wages and overtime in this case is July 9, 2009, if

the violation was willful; otherwise, Plaintiff can seek unpaid wages going back only to July 9, 2010. Moreover, it is undisputed that from August 2012 forward, Defendants paid Plaintiff minimum wage and Plaintiff did not work overtime. Hence, the time period at issue with regard to Counts I and II runs from either July 9, 2009, or July 9, 2010, through July 31, 2012.

### 2. Burden of Proof

"An employee who brings suit under [the FLSA] for unpaid minimum wages or unpaid overtime compensation . . . has the burden of proving that he performed work for which he was not properly compensated." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946). The FLSA imposes on employers an obligation to keep records of employees' hours, 29 U.S.C. § 211(c), and where the employer fails to do so, it can be difficult for an employee to establish with precision the number of uncompensated hours that he worked. In such situations, "an employee [carries out] his burden [of proof] if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Mt. Clemens Pottery, 328 U.S. at 687. If the employee produces such evidence, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." Id. at 687-88; accord Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1315 (11th Cir. 2013) (describing Plaintiff's "relaxed" burden where time records are not kept by employer). It is undisputed that in this case, Defendants did not keep records of the hours that Plaintiff worked during the time

13

period at issue.

### 3. Hours Worked

In the Second Amended Complaint and in the Joint Final Pretrial Statement, Plaintiff claimed that from July 2009 to July 2012 he worked fifty-seven hours per week for Defendants. (Doc. 16 ¶ 8; Doc. 36 at 3). Notwithstanding those assertions, at trial and in his post-trial brief Plaintiff claimed that he had worked seventy-seven hours per week during that time period. Defendants, on the other hand, assert that Plaintiff worked only a few hours per day, though it is undisputed that Plaintiff worked seven days per week. (See Trial Tr. Day 1 at 82 (Test. of Plaintiff); id. at 183 (Test. of Narendra Modha)). Based on the testimony presented at trial, I conclude that Plaintiff typically worked, on average, four and a half hours per day, seven days per week, for a total of thirty-one and a half hours per week, and that Plaintiff failed to establish that he worked more than forty hours in any single week.

During the time period at issue, Plaintiff was on the A.J.'s premises all evening and much of the day, but he was not required by Defendants to be there all of that time, and not all of the time Plaintiff was on the premises was compensable time. As explained in an FLSA regulation, "[a]n employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises." 29 C.F.R. § 785.23. This regulation specifically recognizes that an employee living on his employer's premises "[o]rdinarily . . . may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own." Id. The regulation further recognizes that where an employee lives on the employer's premises, "[i]t is . . . difficult to determine the exact hours worked . . . and any reasonable agreement

of the parties which takes into consideration all of the pertinent facts will be accepted" for purposes of calculating the number of hours worked. Id.

Although at trial Plaintiff maintained that he worked eleven hours per day and denied that he and Mr. Modha reached an agreement as to how many hours he was to work, the evidence at trial established that the parties agreed that Plaintiff could live at the store and work at the store doing cleanup and stocking tasks that previously had been done by an employee who worked two to three hours per day. It was contemplated by Plaintiff and Mr. Modha at the outset that Plaintiff would, like the part-time employee whose duties he assumed, work approximately two to three hours per day. However, the evidence at trial also established that despite that initial agreement, in actuality Plaintiff worked more than three hours per day, and additional FLSA principles must be examined to determine the extent of Plaintiff's compensable time.

The FLSA defines "employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), and where an "employer knows or has reason to believe that [an employee] is continuing to work . . . , the time is working time" even where the employee is working more than his scheduled time, 29 C.F.R. § 785.11; accord Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1314 (11th Cir. 2007). If the employer does not want that work performed, management must "exercise its control and see that the work is not performed . . . . It cannot sit back and accept the benefits without compensating for them." 29 C.F.R. § 785.13. The testimony at trial established that Plaintiff did, with Defendants' knowledge, typically work more than three hours per day. He worked one hour in the morning before Minakshi Modha arrived at the store, whereupon he went back to sleep until late morning. He then woke up and did some stocking and cleaning before going the Modhas' house for

15

lunch in the afternoon. Upon returning to the store in the late afternoon, he meditated for at least an hour, and he sometimes returned to the Modhas' home for dinner. Later in the evening he did some more cleaning and stocking before closing the store. And, as noted earlier, from time to time Plaintiff did other tasks such as assisting elderly customers and accepting deliveries, though that work was irregular and lasted only a few minutes at a time when it did occur.

Plaintiff also at times did work at Hungry Howie's, including delivering pizzas, and sometimes he sought out this work. When Plaintiff delivered pizzas, he was paid for that work in the form of tips, which were typically $7-8 per delivery and which he was allowed to keep. (Trial Tr. Day 1 at 136-37). I find that through those tips, Plaintiff has already been adequately compensated under the law for the time he spent delivering pizzas. The other work that Plaintiff did at Hungry Howie's was irregular and sporadic, depending on when Hungry Howie's employees asked him or allowed him to help at the restaurant when it was busy. Plaintiff did not work at Hungry Howie's every day. (Id. at 70). Sometimes when Plaintiff sought to work at Hungry Howie's, no help was needed and he would then "sit down and read the paper." (Id. at 112 (Test. of Plaintiff)). I have included occasional, unpaid Hungry Howie's work in my assessment that Plaintiff's hours averaged four and a half per day and thirty-one and a half per week.

No evidence was presented that Plaintiff was required to be on the premises when he was not working, and Plaintiff did not establish entitlement to pay for any time other than when he was actually working. At one point in the trial, Plaintiff testified that if he was at the store during business hours and was not asleep, then he should have been paid for that time. (Id. at 156). He also testified that he should be paid for the time he lunched and

showered at the Modhas' house. (Id. at 152-53).[7] Plaintiff felt that if Mr. Modha did not tell him he had a whole day off, then he should have been regarded as working the entire day. (Id. at 153).

Plaintiff's position regarding being owed wages for non-working time at the store is not well-founded. As Plaintiff well knew, he lived at the store not for Defendants' benefit but for his own—he had no other place to live and could not be released from prison until he found a suitable place to report as his residence. Mr. Modha allowed Plaintiff to live at the store after being repeatedly asked to do so by his own brother and by several members of Plaintiff's family. The fact that Plaintiff was on the premises did not inure to the benefit of Defendants except when Plaintiff was working, and he was only owed wages for working time.

There was also testimony presented at trial regarding Plaintiff sometimes being interrupted—for example, during meditation—to make a delivery for Hungry Howie's. (Id. at 56). In this vein, FLSA principles regarding "waiting time" are instructive. "Whether waiting time is time worked under the Act depends upon particular circumstances." 29 C.F.R. § 785.14. "Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged." Skidmore v. Swift, 323 U.S. 134, 137 (1944). Plaintiff was due to be paid for time worked, but I do not find that Plaintiff's otherwise personal time is compensable just because he was occasionally interrupted and asked to work. The evidence presented at trial established that Plaintiff was not "on call" or "engaged to wait" for work by Defendants; instead, when Plaintiff sometimes was at the premises in the

---

[7] After the Court took a brief recess, Plaintiff retreated from this position and agreed he should not be paid for the time he spent lunching, showering, or doing personal errands away from the store. (See Trial Tr. Day 1 at 155-56).

hopes of being given a Hungry Howie's delivery or other task, he was "waiting to be engaged" and only his actual work time is compensable time.

In sum, I conclude from the evidence presented at trial that Plaintiff typically worked an average of four and a half hours per day, seven days per week, for a total of thirty-one and a half hours per week. He did not establish that he worked more than forty hours in any single work week. The latter finding disposes of Plaintiff's overtime claim in Count II of the Second Amended Complaint. Determination of whether Plaintiff was paid minimum wage for the thirty-one and a half hours he worked each week, however, requires further analysis.

### 4.    Wages Owed and Wages Paid

It is undisputed that Plaintiff was paid $750 to $900 in cash monthly during the time period at issue in this case. Defendants claim entitlement to credit for room, board, and other items that they provided to Plaintiff in addition to the cash he was paid. Before turning to the issue of the value of the non-cash compensation, it first must be determined whether the cash Plaintiff was paid met or exceeded the required minimum wage on its own; if it did, it is not necessary to determine the value of non-monetary compensation.

Because Plaintiff was paid monthly, his monthly earnings must be converted to an hourly rate and then compared to the hourly minimum wage. The parties agree that from July 2009 to May 2011, Plaintiff was paid $750 in cash each month; that from June 2011 through March 2012, Plaintiff was paid $800 in cash each month; and that from April 2012 through July 2012, Plaintiff was paid $900 in cash each month. Additionally, the parties agree that the federal minimum wage—not the Florida minimum wage—should be applied in this case. (See Order, Doc. 33, at 6). It is undisputed that from July 9, 2009, to July 23, 2009, the federal minimum wage was $6.55 per hour and that from July 24, 2009, to June

13, 2013, the federal minimum wage was $7.25 per hour.

At $750 per month, Plaintiff's hourly wage for a 31.5-hour workweek amounts to $5.49—less than minimum wage.[8] At $800 per month, Plaintiff's hourly rate for a 31.5-hour workweek is $5.86,[9] and at $900 per month, it is $6.59[10]—both of which are also below minimum wage. Stated conversely, thirty-one and a half hours per week at minimum wage of $7.25 per hour works out to a monthly wage of $989.65.[11] Thus, Plaintiff was not paid minimum wage if only the monthly cash payments he received are considered; for the months in which he was paid $750 there was a shortfall of just under $240; for those in which he was paid $800 there was a shortfall of just under $190; and for the months in which he was paid $900 there was a shortfall of just under $90. However, these shortfalls do not end the minimum wage analysis; additional FLSA principles regarding what constitutes a "wage" must be examined in order to determine whether a minimum wage violation has been established in this case.

Under the FLSA, "wage" is defined as including "the reasonable cost . . . to the employer of furnishing [the] employee with board, lodging, or other facilities." 29 U.S.C. § 203(m). As explained in a regulation promulgated under the FLSA, "in determining whether he has met the minimum wage and overtime requirements of the Act, the employer may

---

[8] ($750/month x 12 months/year) ÷ 52 weeks/year = $173.08/week. $173.08/week ÷ 31.5 hours/week = $5.49/hour.

[9] ($800/month x 12 months/year) ÷ 52 weeks/year = $184.62/week. $184.62/week ÷ 31.5 hours/week = $5.86/hour.

[10] ($900/month x 12 months/year) ÷ 52 weeks/year = $207.69/week. $207.69/week ÷ 31.5 hours/week = $6.59/hour.

[11] 31.5 hours/week x $7.25/hour = $228.38/week. $228.38/week x 52 weeks/year = $11,875.76/year. $11,875.76/year ÷ 12 months/year = $989.65/month.

19

credit himself with the reasonable cost to himself of [such] board, lodging, or other facilities." 29 C.F.R. § 531.27(b). Defendants rely on this regulation in arguing that the total compensation Plaintiff received exceeded the minimum wage.

As used in 29 U.S.C. § 203(m), "reasonable cost" is "not more than the actual cost to the employer of the board, lodging, or other facilities," 29 C.F.R. § 531.3(a), and "[r]easonable cost does not include a profit to the employer or to any affiliated person," id. § 531.3(b); accord Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 474 (11th Cir. 1982) (citing these regulations); Davis Bros., Inc. v. Donovan, 700 F.2d 1368, 1371 (11th Cir. 1983) ("The credit is not for the retail value of the meals, but is limited to the reasonable cost to the employer of providing the meals."). Additionally, FLSA regulations require employers to keep records of the cost of furnishing these items. 29 C.F.R. § 516.27. "[T]he burden of proving the 'reasonable cost' of providing board, lodging, or other facilities [is] on the employer." New Floridian Hotel, 676 F.2d at 474.

In New Floridian Hotel, the appellate court affirmed the district court's determination that the employer failed to establish the reasonable cost of meals. The court noted that the appellants did not keep the records required by 29 C.F.R. § 516.27, and the evidence that the appellants presented in the absence of such records was not sufficient to meet their burden. One piece of evidence was testimony that estimated the cost of lunch at $1.00 and the cost of dinner at $2.00; the court held that "an employer's unsubstantiated estimate of his cost, where the employer has failed to comply with the recordkeeping provisions of the FLSA, . . . does not satisfy the employer's burden of proving reasonable cost." New Floridian Hotel, 676 F.2d at 475. The court also noted that "[t]he district court was entitled to discount [the witness's] unsubstantiated estimate of cost on credibility

grounds." Id. Other evidence presented included profit within it, and the court noted that

"the district court would have had to speculate in order to segregate reasonable cost from

total cost plus profit." Id. at 476. Thus, "the district court correctly denied appellants credit

for meals and lodging." Id.

Decisions in this circuit since New Floridian Hotel have been consistent in

application of these principles. For example, in Washington v. Miller, 721 F.2d 797, 803

(11th Cir. 1983), the court explained:

> It is not possible from the records introduced by [the employer] as to
> the expenses of operating the labor camp to determine what was the
> reasonable cost of the facilities provided.
> This is not to say that the facilities furnished had no value. However,
> to separate the reasonable cost of these facilities from the total cost plus
> profit would require the Court to speculate on the basis of an inadequate and
> inaccurate record. Under these circumstances, the New Floridian case
> requires that the Defendant be denied credit for the meals, wine, lodging, and
> other facilities.

See also Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1514 (11th Cir. 1993)

(reiterating that the employer bears the burden of proving reasonable cost and that the

"employer's unsubstantiated estimate of his cost" does not meet that burden, and finding

that the district court "erroneously placed the burden of proof on" the employees); Leonard

v. Carmichael Props. & Mgmt. Co., 614 F. Supp. 1182, 1187-88 (S.D. Fla. 1985) (finding

that the employer did not meet burden of establishing entitlement to credit under 29 U.S.C.

§ 203(m) where "[it] [wa]s impossible for the court to determine what was the reasonable

cost of the apartment because defendant . . . failed to proffer any evidence as to the

expenses of providing it for plaintiff" and "insist[ed] that the retail value, rather than cost,

[wa]s the appropriate measure"); Mendoza v. Uptown Buffet, Inc., No. 09-22799-CIV, 2010

WL 3768052, at *4 (S.D. Fla. Sept. 16, 2010) (denying meal and lodging credits to employer

where employer did not introduce evidence of reasonable cost); Maldonado v. Alta Healthcare Grp., Inc., No. 6:12-cv-1552-Orl-36DAB, 2014 WL 1661265, at \*8 (M.D. Fla. Mar. 26, 2014) (finding that the defendants did not substantiate reasonable cost of facilities provided where they presented only "a one-page, bare-bones document" ostensibly breaking down "implicit values" of room, food, and other items without explanation, and the supporting witness testified in his deposition "that the values had nothing to do with the actual cost of the benefits provided" to the employee).

Defendants claim credit for three items provided to Plaintiff: lodging, food, and gasoline/use of the Modhas' car. Defendants' evidence in support of these claimed credits was, for the most part, insufficient as a matter of law to meet their burden, but they did present competent evidence supporting some credit.

### a.   Lodging

It is undisputed that Plaintiff lived at A.J.'s from 2006 until June 13, 2013; indeed, the reason that Plaintiff went to A.J.'s at all was because he needed a probation-approved place to live so that he could be released from prison. However, Defendants did not present evidence of the reasonable cost of providing lodging to Plaintiff, and thus no lodging credit can be awarded to them. Mr. Modha testified that he estimated the value of the lodging that he provided to Plaintiff at $100-$125/week. (Trial Tr. Day 2 at 169). However, no basis was provided for Mr. Modha's estimate, and in any event it is not the *value* of the lodging but the *cost to the employer of providing the lodging* that is determinative in this FLSA context.[12] See, e.g., Washington, 721 F.2d at 803. Defendants'

---

[12] For this reason, Plaintiff's estimate that an apartment elsewhere would have cost him $800 per month is also not useful in this analysis.

request for lodging credit therefore must be denied.[13]

#### b.   Board

It is undisputed that Defendants provided meals to Plaintiff every day and allowed him to eat whatever he wanted at A.J.'s and at Hungry Howie's. There was testimony that Plaintiff typically ate a honey bun or granola bar from A.J.'s for breakfast, and Plaintiff admittedly ate lunch at the Modhas' home daily. He also was provided with dinner either at the Modhas' home or at A.J.'s.

However, Defendants did not present evidence of the cost of meals. They admittedly did not keep records regarding the food that was provided to Plaintiff, and Krupa Modha, who prepared the lunches, did not know how much those meals cost. (Trial Tr. Day 1 at 176-77, 179).[14] Later in the trial, Mr. Modha was able—rather impressively—to recite the prices of many items on the Hungry Howie's menu, (Trial Tr. Day 2 at 151), but that testimony does not establish the cost to Defendants of providing food to Plaintiff; retail costs include profit, which are not allowable, and Plaintiff largely prepared his own pizza and other food at Hungry Howie's in any event, (id. at 152). And, despite testimony regarding Plaintiff having a granola bar or honey bun and coffee each morning for

---

[13] An FLSA regulation provides that "[f]acilities furnished in violation of any Federal, State, or local law, ordinance or prohibition will not be considered facilities 'customarily' furnished" within the meaning of 29 U.S.C. § 203(m). 29 C.F.R. § 531.31. There was testimony that A.J.'s was not zoned for residential use, and thus arguably Defendants could not claim credit for the lodging provided there. However, due to the unique circumstances of this case—the reason that Plaintiff was living at A.J.'s and the unavailability of alternative lodging—it is questionable whether this regulation should be given effect here. Of course, Defendants' failure to present evidence of the cost of providing lodging moots this issue.

[14] At one point during trial, Krupa testified that "[m]aybe $20" was the value of the food provided to Plaintiff at lunch. (Trial Tr. Day 1 at 176). However, she was then impeached with her deposition testimony that she did not know the cost of a typical lunch that she prepared. (Id. at 177). In any event, the Court rejects $20 as the cost of a typical Plaintiff lunch, and no competent evidence of lunch cost was presented.

breakfast, (id. at 53), no evidence or testimony was introduced regarding the cost of these items, and I am not free to speculate on such cost. Moreover, Mr. Modha's testimony that the food Plaintiff ate cost an average of $25-$30 per day, (id. at 154-55), is the type of "employer's unsubstantiated estimate of cost" that has been rejected in New Floridian Hotel and subsequent cases.

As to one food-related item, however, I find that competent testimony was presented to support a food credit to Defendants. Mr. Modha provided unrebutted testimony that Plaintiff drank bottled water at A.J.'s—a minimum of four bottles per day—and that these bottles cost (not sold for) sixty or seventy cents each. (Id. at 153). As the owner of the store, Mr. Modha is competent to testify as to costs of items sold there, and thus Defendants have established entitlement to a credit of $73 per month[15] for water consumed by Plaintiff. In all other respects, however, Defendants did not meet their burden of proving the reasonable cost of providing food or beverages to Plaintiff.

### c.   Gasoline/Vehicle Use

Finally, Defendants claim credit for allowing Plaintiff to use one of the Modhas' vehicles for personal purposes and for providing gasoline for that use. Such transportation and fuel costs are within the meaning of "other facilities" under 29 U.S.C. § 203(m). See 29 C.F.R. § 531.32(a). Defendants did establish entitlement to some credit for providing a car and gasoline to Plaintiff.

It is undisputed that Plaintiff was allowed to drive a Modha car for personal use, including to probation appointments, to counseling appointments, to visit his son in Daytona Beach, and to the Modhas' house for lunch each day—eight miles each way. He also used

---

[15] 60 cents/bottle x 4 bottles/day x 365 days/year = $876/year.  $876/year ÷ 12 months/year = $73/month.

the car to make pizza deliveries for Hungry Howie's, and that enabled him to earn extra money in the form of tips.

Mr. Modha testified that the average cost of gasoline over the period at issue was $3.50 per gallon, (Trial Tr. Day 2 at 164), and that the car that Plaintiff primarily drove—the Dodge Avenger—averages twenty miles to the gallon, (id. at 163). Minakshi Modha also drove the Avenger; estimates at trial were that Plaintiff drove it 50-60% of the time and Minakshi drove it 40-50% of the time. (Id. at 73 (50/50) (Test. of Minakshi Modha); id. at 162 (60/40) (Test. of Narendra Modha)). Mr. Modha acknowledged that he sometimes, but not often, drove the Avenger and that his son and Minakshi's son occasionally drove it. (Id. at 192-94).

Mr. Modha testified that he purchased the Avenger at the end of October 2009 and that at the time of trial in late January 2014 the car had 107,000 miles on it. (Id. at 161). Based on the Avenger's mileage and Plaintiff's historical use of the car from October 2009 to June 2013, Mr. Modha estimated that Plaintiff drove the car 1,000-1,300 miles per month. (Id. at 161, 163).

In light of the testimony from Mr. Modha, Minakshi Modha, and Plaintiff himself regarding Plaintiff's use of Mr. Modha's vehicles for his personal benefit throughout his employment, I find that 1,000 miles per month is a reasonable assessment of that use. And, as the owner of several gas stations, Mr. Modha is competent to testify as to the cost of gasoline, and I credit his testimony as to a $3.50 per gallon average cost during the time period at issue. At twenty miles per gallon, Plaintiff used fifty gallons of gasoline per month,

for a gasoline cost of $175 per month.[16] Defendants have established entitlement to a monthly credit in this amount for gasoline.

Mr. Modha also testified regarding costs involved in maintaining and using the Avenger. He testified that he paid for insurance on the Avenger and alluded to the vehicle's periodic need for new tires; but, no testimony or other evidence as to the cost of these items was presented and no credit for them can be given. However, Mr. Modha also testified that he had the oil changed on the Avenger every 3,000 miles and that service cost "twenty, thirty bucks." (Trial Tr. Day 2 at 155, 164). Allotting one-third (1,000/3,000) of the oil change cost to Plaintiff yields a monthly credit of $6.67.[17] Defendants are entitled to a credit in this amount for maintenance of the Avenger, for a total vehicle-use credit of $181.67.

### d.  Conclusion as to Wages Paid and Wages Owed

In sum, Defendants failed to prove at trial the reasonable cost of providing lodging to Plaintiff, and thus they are not entitled to any lodging credit. On the other hand, they did establish $73 in monthly bottled water cost and $181.67 in monthly vehicle-use cost, for total credit under 29 C.F.R. § 531.27(b) of $254.67 per month.  Thus, the total compensation that Plaintiff received monthly from July 2009 to May 2011 was $1,004.67[18]; from June 2011 through March 2012, $1,054.67[19]; and from April 2012 through July 2012,

---

[16] 1000 miles/month ÷ 20 miles/gallon = 50 gallons/month.  50 gallons/month x $3.50/gallon = $175/month.

[17] $20/3 = $6.67.

[18] $750 + $254.67 = $1,004.67.

[19] $800 + $254.67 = $1,054.67.

$1,154.67.[20] None of these amounts is less than minimum wage—calculated earlier as a monthly rate of $989.65.[21] Thus, when Defendants are given credit for the board and "facilities" as to which they presented competent evidence at trial, no minimum wage violation has been established in this case, and Plaintiff does not prevail on Count I.

## B.    Count III—Retaliation

The FLSA makes it "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under" the FLSA. 29 U.S.C. § 215(a)(3). Plaintiff alleges that Defendants retaliated against him after they found out about this lawsuit in the summer of 2012. He asserted several forms of retaliation in his Second Amended Complaint, but prior to trial I ruled that the only means of retaliation that remained viable for trial was the reduction of Plaintiff's hours in August 2012. (See Order, Doc. 33, at 7-10).

Plaintiff contends that after Defendants learned of this lawsuit and that Plaintiff was accusing them of minimum wage and overtime violations, Defendants retaliated against him by cutting his hours. The record evidence does support the contention that Plaintiff worked fewer hours beginning in August 2012. Defendants began keeping records of Plaintiff's hours during August, when a payroll company was brought in to handle the growing number of employees at Mr. Modha's three businesses and insisted that records of hours worked be kept for every employee, including Plaintiff. Plaintiff was paid in cash

---

[20] $900 + $254.67 = $1,154.67.

[21] Stated differently, when converted to hourly rates, $1,004.67 per month for a 31.5-hour workweek equates to $7.36/hour; $1,054.67 per month equates to $7.73/hour; and $1,154.67 per month equates to $8.46/hour. Each of these hourly rates exceeds the $7.25 federal minimum wage.

27

from the A.J.'s cash register for August 1-12, 2012—$378.67 for 49.5 hours of work—hours that were recorded on a daily time log and ranged from three to five hours per day, with four hours per day being the most common number of hours worked during that period. (Defs.' Trial Ex. 7 at 8 (receipt showing cash payout of $378.67); Defs.' Trial Ex. 9 at 1-2 (time log showing hours worked for August 1 through August 12, 2012); Defs.' Trial Ex. 10 at 1 (same)). From August 13 on, however, Plaintiff typically worked only 2.5 hours per day, and he worked three hours or more in a single day only three times during the rest of his tenure at A.J.'s, which ended with his resignation on June 13, 2013. (See Defs.' Trial Exs. 9 and 10 (showing fewer than three hours worked for every day except April 26, 2013 (3.25 hours), May 14, 2013 (3.02 hours) and May 21, 2013 (3.00 hours))). Although I reject Plaintiff's suggestion that Defendants began using the payroll company in order to cut Plaintiff's hours rather than due to needs of the growing businesses, I do find that Plaintiff's hours were reduced after Defendants found out about the lawsuit sometime in early August 2012. Defendants have offered no explanation for the cutting of Plaintiff's hours,[22] and I conclude that his hours were reduced as a consequence of Plaintiff's filing of this lawsuit.

However, Plaintiff has not established a basis for an award of damages on this claim. In the Joint Final Pretrial Statement, in which parties claiming damages are required to list "a statement of the elements of each [claim for damages] and the amount being sought with respect to each such element," M.D. Fla. Local Rule 3.06(c)(7), Plaintiff

---

[22] Additionally, Defendants have not argued that Plaintiff did not engage in "protected activity" under the FLSA, which requires in part that Plaintiff had an objectively reasonable, good faith belief that Defendants had violated the FLSA's minimum wage or overtime provisions. See, e.g., Perez v. Brands Mart Serv. Corp., No. 10-61203-CIV, 2011 WL 3236022, at *10 (S.D. Fla. July 28, 2011). I will therefore not address that issue.

28

requested "[e]motional distress for retaliation $100,000.00," (Doc. 36 at 4).[23] He did not list any other type of damages for this claim.[24] And, in his Amended Post-Trial Brief, Plaintiff makes no attempt to explain what damages he seeks on this claim—or a basis for any such damages—other than proposing that judgment be entered "regarding [Plaintiff's] claim of retaliation, jointly and severally against [b]oth Defendants, in the amount of $100,000." (Doc. 63 at 34). This request for $100,000 is consistent with the request in the Joint Final Pretrial Statement, which was for emotional distress in that amount.

The law in this circuit is not settled regarding whether emotional distress damages are recoverable for FLSA retaliation. The FLSA provides that "[a]ny employer who violates the provisions of section 215(a)(3) of this title [the anti-retaliation provision] shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Although several other circuits have held that emotional distress damages are recoverable under this section of the FLSA,[25] the Court of Appeals for the Eleventh Circuit has not squarely addressed this question, and district court decisions have

_____

[23] Similarly, in the Second Amended Complaint Plaintiff alleged that "[a]s a result of the retaliation, [Plaintiff] has suffered damages, including emotional distress and pain and suffering." (Doc. 16 ¶ 39).

[24] In contrast, Plaintiff did, in the Joint Final Pretrial Statement, make detailed calculations of damage amounts—in the form of lost wages—for his minimum wage and overtime claims. (Doc. 36 at 3-4).

[25] See, e.g., Moore v. Freeman, 355 F.3d 558, 563-64 (6th Cir. 2004); Travis v. Gary Cmty. Mental Health Ctr., Inc., 921 F.2d 108, 111-12 (7th Cir. 1990); see also Adams v. Cedar Hill Indep. Sch. Dist., Civ. Action No. 3:13-CV-2598-D, 2014 WL 66488, at *6 (N.D. Tex. Jan. 8, 2014) (discussing lack of consensus among district courts in the Fifth Circuit and noting decisions from other circuits).

29

reached differing conclusions. Compare, e.g., Vaccaro v. Custom Sounds, Inc., No. 3:08-cv-776-J-32JRK, 2010 WL 1223907, at *5 (M.D. Fla. Mar. 4, 2010) (discussing history of the issue and predicting "that the Eleventh Circuit would conclude that compensatory damages for emotional distress can be awarded in FLSA cases"), and Bogacki v. Buccaneers Ltd. P'ship, 370 F. Supp. 2d 1201, 1205-06 (M.D. Fla. 2005) (allowing claim for emotional distress damages for FLSA retaliation to proceed), with Bolick v. Brevard Cnty. Sheriff's Dep't, 937 F. Supp. 1560, 1567 (M.D. Fla. 1996) (concluding that "emotional . . . damages are unavailable under the FLSA").

In any event, even assuming that the Eleventh Circuit would allow emotional distress damages in FLSA retaliation cases, Plaintiff did not present evidence supporting an award of emotional distress damages in this case. No testimony or other evidence of compensable emotional distress was adduced at trial, and in his post-trial brief Plaintiff makes no argument or explanation for such an award; as noted earlier, he merely sets forth a proposed judgment amount of $100,000. Accordingly, Plaintiff has not established that he suffered compensable damages on this claim, and it fails for this reason.

III.   **Conclusion**

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. As set forth herein, Plaintiff does not prevail on any of his claims in this case.

2. Defendants' ore tenus "motion for judgment as a matter of law"[26] (Doc.

---

[26] Defendants made their motion at the close of Plaintiff's evidence as a "Rule 50 motion." (Trial Tr. Day 1 at 198). Federal Rule of Civil Procedure 50, however, pertains to "judgment as a matter of law in a jury trial." This case was tried to the Court, not a jury, and the analogous rule is Federal Rule of Civil Procedure 52(c), which provides:

47) is **deemed moot**.

3. The Clerk is directed to enter a judgment providing that Plaintiff shall take

nothing from Defendants on any of his claims. Thereafter, the Clerk shall

close this case.

**DONE** and **ORDERED** in Orlando, Florida, on May 29, 2014.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties

---

Judgment on Partial Findings.  If a party has been fully heard on an issue
during a nonjury trial and the court finds against the party on that issue, the
court may enter judgment against the party on a claim or defense that, under
the controlling law, can be maintained or defeated only with a favorable
finding on that issue.  The court may, however, decline to render any
judgment until the close of the evidence. . . .

In this case, the Court reserved ruling on Defendants' motion, (see Trial Tr. Day 1
at 199), and thereby "decline[d] to render any judgment until the close of the
evidence" as stated in Rule 52(c).  The Court has instead, in this Order, made the
findings and conclusions contemplated by Federal Rule of Civil Procedure 52(a).

31